UNION INDEMNITY Co. *v.* ÆOLIAN Co. *et al.**

(Division B. February 18, 1929. Suggestion of Error Overruled April 1, 1929.)

[121 So. 123. No. 27507.]

340

*Corpus Juris-Cyc References:   Mortgages, 41CJ, section 571, p. 606, n. 38.

*Manning W. Heard* and *Wm. E. Westerman,* both of New Orleans, La., 'and *Hirsch, Dent & Landau,* for appellant.

*Vollor & Kelly* and *Brunini & Hirsch,* for appellees.

Argued orally by *R. L. Dent,* for appellant, and *John Brunini,* for appellees.

GRIFFITH, J.  On September 15, 1923, the Æolian Company, a corporation, executed its trust deed on an unimproved city lot in Vicksburg to G. L. Miller & Co., a corporation, as trustee, to secure bonds in the sum of two hundred ninety thousand dollars.  The Æolian Company owned no other property, and had no other assets than the said lot, valued at about twenty-eight thousand dollars.  It was the purpose of the trust deed aforesaid to secure funds for the erection on said lot of a four-story apartment building to be known as Æolian apartments, which it was estimated would cost three hundred thousand dollars, and it was intended by the sale of stock in the owner company to raise the difference between the proceeds of the two hundred ninety thousand dollars

in bonds, secured as aforesaid, and the three hundred thousand dollars building cost.

On the 27th day of February, 1924, the owner secured a contract with Havis & Sharp, contractors, for the erection and completion of said apartment building, the said contractors to furnish all the material and labor and to do everything necessary to the end aforesaid, at a contract price of three hundred thousand dollars, and on March 4, 1924, the Union Indemnity Company, appellant, executed and delivered unto the owner its bond in the said sum of three hundred thousand dollars, by the terms of which the appellant obligated itself, as surety, that the said contractors would fully perform all the stipulations of their said contract for the erection and completion of the said apartment building. In the said builder's contract it was expressly mentioned that the contractor should be paid in monthly installments eighty-five per cent of the labor and materials incorporated in the work and that so much of the funds as were to be paid out of the bond issue aforesaid were to be disbursed by the said trustee according to a disbursement agreement made a part of the contract.

In the trust deed securing the bonds, which trust deed was promptly filed for record, there was a provision as follows: "Said owner further covenants and agrees that . . . it shall not permit any mechanic's, materialmen's, laborer's, or other liens or privileges to fasten upon said property or any of the improvements thereon . . . which will in any wise effect the security of this deed of trust . . . or whereby the lien of this indenture might or could be impaired." In the affidavit of appellant filed as a part of its claim, now here being litigated, it is recited: "The bonds of the Æolian Company were issued and sold for the purpose of erecting these improvements and this purpose was stated in the prospectus and was known or must be presumed to have been known to each and every purchaser of the bonds.'

And appellant introduced the said prospectus in evidence, one of the recitals of the said prospectus being as follows: ''Surety Bond: Completion of the structure free from liens will be guaranteed by a surety bond for one hundred per cent of the contract to be furnished by the contractor.''

The contractors proceeded with the work until the latter part of December, 1924, when, the work being unfinished, they admitted their inability to complete the building or to go any further with their contract, and on January 7, 1925, they executed a formal written instrument to that effect. At that time the contractors had been paid on monthly installments an aggregate of two hundred fifty-four thousand seven hundred seventy-three dollars and forty-five cents, and there were outstanding claims against them for material, etc., in an aggregate of more than fifty thousand dollars. And there was in the hands of the trustee representing the unexpended proceeds of the sales of bonds the sum of thirty-three thousand dollars, which, when added to the two hundred fifty-four thousand seven hundred seventy-three dollars and forty-five cents already paid the contractors, would make two hundred eighty-seven thousand seven hundred seventy-three dollars and forty-five cents, or twelve thousand two hundred twenty-six dollars and fifty-five cents less than the contract price for a completed building.

At this juncture, the owner having notified the surety of the contractor's default, the appellant surety, the owner, and the contractors met to consider what was to be further done. It was found to be the opinion of the contractors that the building could be completed for the sum of thirty-three thousand dollars, then held by the trustee, and thereupon the appellant surety, the owner, and the contractors entered into a written agreement dated January 8, 1925, that the surety company would pay off all claims accrued or accruing prior to December 26, 1924, which claims it turned out afterwards amounted

to the total sum of fifty-nine thousand one hundred fifty-one dollars and thirty-eight cents; that the surety company would agree that the balance of thirty-three thousand dollars then in the hands of the trustee should be disbursed to the owner; that the contractors should be relieved of said contract; that the owner would take over the said contract and would obligate itself to complete the same for the said balance of thirty-three thousand dollars; that the surety company, upon payment of the claims accruing prior to December 26, 1924, would be discharged of its contract of suretyship; and that on completion of the building the said owner would pay to the said surety the said sum of twelve thousand two hundred twenty-six dollars and fifty-five cents, being the difference between the two hundred eighty-seven thousand seven hundred seventy-three dollars and forty-five cents aforementioned and the contract price of three hundred thousand dollars.

The work was thereupon resumed, but, as might have been expected in view of the entire situation, the said thirty-three thousand dollars did not complete the building, and the owner having no means to complete the same, as was all along known to all parties, it became necessary to appoint a receiver. The trustee was appointed, and, under the supervision of the trustee receiver, by means of receiver's certificates, the building was finally completed, it having required to do so the sum of twenty-four thousand nine hundred fifty-nine dollars and eighty-seven cents, in addition to the said thirty-three thousand dollars. The total cost of the building therefore was two hundred fifty-four thousand seven hundred seventy-three dollars and forty-five cents, plus fifty-nine thousand one hundred fifty-one dollars and thirty-eight cents, plus thirty-three thousand dollars, plus twenty-four thousand nine hundred fifty-nine dollars and eighty-seven cents, or three hundred seventy-one thousand eight hundred eighty-four dollars and seventy

cents. It is not as definitely shown as should be who furnished the money on the said receiver's certificates, but the fair inference from what testimony there is on that subject is that the bondholders through the trustee furnished these funds, and that fact seems to be conceded in the briefs and argument. This produces the result therefore that the owner and bondholders furnished funds for the completion of the building in the following amounts: two hundred fifty-four thousand seven hundred seventy-three dollars and forty-five cents, plus thirty-three thousand dollars, plus twenty-four thousand nine hundred fifty-nine dollars and eighty-seven cents, a total of three hundred twelve thousand seven hundred thirty-three dollars and thirty-two cents, or twelve thousand seven hundred thirty-three dollars and thirty-two cents in excess of the contract price. The trustee for the bondholders foreclosed its deed of trust, and at the sale the property brought one hundred sixty thousand dollars, it being the order of the court in decreeing the sale that the proceeds should stand in lieu of the property. Against these funds appellant surety company filed its claim, first for the twelve thousand two hundred twenty-six dollars and fifty-five cents stipulated to be paid it under the agreement of January 8, 1925, and for the further sum of seventeen thousand eight hundred twenty-three dollars and forty-five cents which it says represented unauthorized payments made to the contractor before January 8, 1925. Appellant claimed priority for both these amounts. The chancellor denied the claim of seventeen thousand eight hundred twenty-three dollars and forty-five cents, and denied priority for the claim of twelve thousand two hundred twenty-six dollars and fifty-five cents.

We think the statement of the salient facts, without more, demonstrates that the chancellor was correct. It will be observed from the statement that the bondholders were not present when the agreement of January 8, 1925, was made between the appellant surety company

and the owner and the contractor, and it is nowhere pretended that these bondholders were ever consulted about that agreement. It is true that the trustee in the bond deed of trust agreed to pay over the balance of thirty-three thousand dollars in its hands, but it made no further agreement than that; and, even if it had agreed further, it had no power or authority under the trust deed to make any agreement or surrender which would in any wise impair the security of said trust deed any more than it would have had power to cancel the trust deed to a part or all of the property described therein, and all parties knew this. All the parties to the agreement of January 8, 1925, knew that both the contractors and the owner had no assets whatever or any means or ability to complete said building beyond the thirty-three thousand dollars then turned over; and, when that agreement was made, every party to it knew, or ought to have known, that the effect of it was to reduce the contract price for a completed building from three hundred thousand dollars to two hundred eighty-seven thousand seven hundred seventy-three dollars and forty-five cents, and that it would impair the security of the bondholders to the extent of said reduction; and moreover, the appellant surety company then knew, and now asserts it as a fact, that the bondholders had bought on the faith of the prospectus, which recites that the completion of the building up to the sum of three hundred thousand dollars was guaranteed by a surety bond in one hundred per cent of the contract price.

If, when a bond mortgage is given to secure funds for the erection of improvements, and a contract is secured to cover the entire work of the completion of the improvements, and a contractor's bond is furnished securing such completion, an insolvent owner, an insolvent and defaulting contractor, and the surety may get together and alter their respective obligations to the detriment of the bondholders without the latters' knowledge

or consent, and our supreme court should hold such action to be valid, not only as to the immediate parties but as to bondholders, then there would be no further improvements or construction of improvements in our state upon funds furnished by investors in improvement bonds. The agreement of January 8, 1924, may be good as between the immediate parties thereto; but as to those not parties, and who had supplied their money upon the faith of the assurances theretofore given, as was given in this case, we shall not permit the inequity that they shall be dealt with as was and is attempted here. The immediate parties were proceeding perhaps in all good faith, but in a manner which, as we think, the law will not permit in such a situation, except as strictly concerns said immediate parties.

*Affirmed.*